IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 22, 2005 Session

## STATE OF TENNESSEE v. MAURICE DARNELL TYLER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-A-432     J. Randall Wyatt, Jr., Judge**

---

**No. M2005-00500-CCA-R3-CD - Filed February 1, 2006**

---

This is a direct appeal as of right from convictions entered on a jury verdict of guilty of two first degree premeditated murders. The jury sentenced the Defendant to life without the possibility of parole for one conviction, and he received a life sentence for the other. On appeal, the Defendant advances five arguments: (1) the state violated his equal protection rights by striking three African Americans during jury selection; (2) the court erred by admitting into evidence a photograph of one of the victims; (3) the court erred by admitting into evidence a threatening statement made by the Defendant three years prior to the date of the crimes at issue in this case; (4) the court erred by failing to declare a mistrial when the State made a statement during closing argument which was unsupported by the evidence; and (5) the evidence was insufficient to support the jury's guilty verdicts. We affirm the judgments of the court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Paul J. Bruno, Nashville, Tennessee, for the appellant, Maruice Darnell Tyler.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The convictions at issue in this appeal stem from an apparent revenge killing in which the Defendant, Maurice Darnell Tyler, fired twenty-eight shots into a vehicle parked outside the Outer Limits night club in Nashville during the early morning hours of November 25, 2002. The occupants

of the vehicle, victims Cayra Caruth and Monte Campbell, were killed. Based on eye-witness accounts, the Defendant was deemed a suspect and a warrant was issued for his arrest. After receiving attention in the news media, the Defendant turned himself in. In March of 2003, he and his co-defendant, Christopher Schultz, were indicted by a Davidson County grand jury on two counts of first degree premeditated murder and one count of felony murder. See Tenn. Code Ann. § 39-13-202(a)(1) and (a)(2). Mr. Schultz entered guilty pleas, and the Defendant elected to go to trial.

At trial, the State's leading witness, Mr. Jared Johnson, testified that on the night of the murders he was employed as the night manager for the Outer Limit night club in Nashville. At approximately 2:30 on the morning of November 25, 2002, he was standing outside the club when he first heard multiple gunshots, then saw muzzle fire, and subsequently witnessed a man shooting into the passenger side of a silver Mercury Cougar parked in an adjacent parking lot.[1] Mr. Johnson recalled initially thinking he was witnessing an act of vandalism because he could not see the victims laying in the car and because the shooter "looked pretty calm" as he shot, reloaded, shot some more, and then casually walked to a waiting car which drove off.

According to Mr. Johnson's testimony, the shooter entered the passenger side of a black, four-door Saturn driven by another man, and the two fled the scene. Mr. Johnson followed the car in his own vehicle. During a rather lengthy and often high-speed chase, Mr. Johnson placed a call on his cellular phone to the 911 dispatcher to report the crime and also video taped much of the pursuit.[2] Mr. Johnson eventually broke-off his pursuit when the fleeing suspects entered a small side-street in Antioch, which he feared may have been a dead-end. However, during the chase he obtained the license plate number of the Saturn. He also saw the shooter's face on two occasions; once at the very beginning of the chase when the shooter turned around in the passenger seat and looked directly at him, and once again mid-way through the pursuit when Mr. Johnson pulled up alongside the passenger's side of the Saturn on Interstate 24 and "got another good look at the shooter."

After he terminated the pursuit, Mr. Johnson returned to the Outer Limit and reported to the police, who were already on the scene. He described the shooter as a light-complected Hispanic or African-American male with short, black hair, pointed ears, approximately five feet eight or nine inches tall, and wearing a black jacket. He further informed the police that he remembered seeing the same man hanging around the parking lot before the shooting. Later, when Mr. Johnson saw the Defendant's photo in the news media as one of several suspects involved in the case, he immediately called the police and identified the Defendant as the shooter. On cross-examination, Mr. Johnson admitted that he never saw the driver of the get-away vehicle.

----

[1]While Mr. Johnson initially reported to the police that the shooter got into the driver's side of the car, upon further reflection, he realized it was the passenger's side, and he called the detective in charge and amended his statement to reflect the shooter entering the passenger side of the get-away vehicle.

[2]The record reveals that Mr. Johnson was an amateur videographer who often kept a video camera in his vehicle. The video of the pursuit, taped through the front windshield of Mr. Johnson's vehicle as he followed the shooter fleeing from the crime scene, was entered into evidence and played for the jury.

Ms. Tashiba Hazelitt testified that she had been friends with victim Cayra Caruth for fifteen or sixteen years and had known victim Monte Campbell for six or seven years. The night of the shooting, she and Ms. Caruth met Mr. Campbell at the Outer Limit. Ms. Hazelitt further testified that she observed the Defendant walk by her and the victims "at least three times" that night with his hand in his pocket, looking at them. Later, Ms. Caruth and Mr. Campbell left the club and went outside. The shooting occurred shortly thereafter. Mr. Hazelitt also stated that when the Defendant's photograph was shown on television she immediately recognized him as the man who walked by her and the victims several times, and she contacted the police to report this information.

Ms. Quaneisheia Wiggins testified that on the night of the murders she and several friends were standing in the parking lot of the night club and witnessed the shooting. She observed a man shoot into the passenger side window of a car, stop, bend down, then continue to shoot more, and eventually flee in a black, four-door Saturn. She testified that she saw only the side profile of the shooter, but could tell that he had black hair and a "dark complexion." Ms. Wiggins further explained the shooter's skin color was darker than that of the Assistant District Attorney presenting the State's case, whom she described as "white," but lighter than her own complexion, concluding: "he could have been [H]ispanic. He could have been mixed. He could have been yellow." On cross-examination, Ms. Wiggins denied she initially reported to the police that the shooter was white, insisting she said he was "light-complected." A video tape of Ms. Wiggins' interview with the police, conducted the same night the murders occurred, was played for the jury. In this video Ms. Wiggins clearly described the shooter as a "white guy."

Detective Johnny Ray Crumby, Jr., of the Nashville Police Homicide Division, testified that he was the lead detective in this case, and upon his arrival at the crime scene he interviewed eight to ten witnesses, including Mr. Johnson who provided him with the license plate number of the get-away vehicle. Based on this information, Detective Crumby was able to learn that the black, four-door Saturn used to flee the scene was registered to Mrs. Penelope Tafoya, the Defendant's mother. The Detective also stated that when Mr. Christopher Schultz turned himself in, he provided the information that eventually led to the discovery of the car at an apartment complex in Madison. When the police found the car, it had been washed and "wiped down" on the inside. No fingerprints were recovered, but a flyer advertizing a musical group, which had been distributed to all the vehicles in the parking lot of the Outer Limit the night of the murders, was found in the car.

On cross-examination, Detective Crumby stated that Mr. Johnson called and identified the Defendant as the shooter only after the Defendant was shown on television when he turned himself in. When questioned about the physical descriptions of the shooter he received from the witnesses, Detective Crumby stated that the descriptions were all "in line with each other" with regard to height, weight, clothing, hair color, hair style, and gender. Furthermore, the Detective testified that all the witness accounts described a similar sequence of events.

Officer Warren Fleak, of the Nashville Police Department Crime Scene Investigation Identification Unit, testified that he investigated and documented the crime scene, and collected and

labeled evidence. He stated that he found twenty-eight .40 caliber shell casings and a nine-round magazine or clip from a Glock handgun.

Officer Charles Blackwood, Jr., of the Nashville Police Department Identification Unit, testified that he processed the victim's vehicle after it was towed to the police Field Office Building. The car's passenger window was shattered, and there were three projectile holes on the outside passenger side door and doorpost and "multiple" projectile holes throughout the interior of the vehicle. Officer Blackwood stated that he counted nineteen bullet strikes inside the vehicle, not counting those in the bodies of the two victims, and he removed twenty projectiles from the interior of the vehicle. Officer Blackwood also testified that he found the male victim laying across the front passenger side seat with his feet against the door and his head in the back seat. He found the female victim seated in the driver's seat.

Officer Kendall Yaeger, of the Nashville Police Department Forensic Section, was certified by the court as an expert in firearms and tool mark identification. Officer Yaeger testified that the empty shell casings removed from the scene were all .40 caliber, and the tool markings indicated that they had been fired by either a Glock or a Smith and Wesson. The grooves cut into the projectiles collected indicated that they had been fired by either a Glock, Heckler or Koch firearm. The empty Glock magazine recovered at the scene was capable of holding nine rounds. Officer Yaeger surmised that if only nine-round magazines were used, to fire all twenty-eight shots the shooter would have had to start with one fully-loaded magazine and one round in the chamber, fire all ten rounds, then reload another nine-round magazine and fire all nine shots, then reload yet again and fire nine more times.

Dr. Feng Li, of the Medical Examiner's Office, was certified by the court as an expert in forensic pathology. He testified that he performed the autopsies on the two murder victims Dr. Li stated that Ms. Caruth suffered eight gunshot wounds, one of which entered her neck and passed through her brain. Dr. Li explained that any one of her multiple gunshot wounds were potentially fatal, especially the head wounds. Dr. Li testified that Ms. Caruth's "cause of death [was] multiple gunshot wounds." Dr. Li also testified that Mr. Campbell suffered sixteen gunshot wounds, including multiple wounds to the chest and one wound which severed his spinal cord. Dr. Li stated that Mr. Campbell's "cause of death [was] multiple gunshot wounds."

Pursuant to a stipulation of fact, evidence was admitted which stated that victim Monte Campbell received parole and was released from prison on August 8, 2002. After a brief jury-out discussion, Officer Christopher Steele, formerly of the Lewisburg Police Department, was allowed to testify. Officer Steele stated that he knew of victim Monty Campbell and the Defendant from a previous altercation that had occurred several years prior to the murders in the case at hand. Officer Steele stated that he had been present at a preliminary hearing for a home invasion case in which Mr. Campbell was the defendant, and the Defendant in this case was the victim. While standing in a hallway outside the courtroom, Officer Steele heard the Defendant state he was "going to get Mr. Campbell, get him back when he . . . got out of jail." Officer Steele testified that he had heard victims blow off steam in such manner before, so he said to the Defendant, you do not mean that,

to which the Defendant replied: "[n]o, I will get him back." Officer Steele stated that when he learned of the murders in this case and the parties involved, he contacted the Homicide Department of the Nashville Police Department. On cross-examination, Officer Steele admitted that at the time the statements were made he did not think anything of it, and he did not file a report about the incident.

The defense called Mr. Robert Sherrill, who testified that on the night of the murders he and the Defendant drove to the Outer Limit night club in his car, a Chevrolet Lumina, arriving shortly after midnight. He then stated that approximately one and a half hours before the shooting, the Defendant asked for the keys to his car, and left the club. Mr. Sherrill stated that friends later drove him home, and when he arrived home sometime after 3:00 am, the Defendant was at his house. On cross-examination, Mr. Sherrill admitted that he was close friends with the Defendant, and that he did not know where the Defendant was from 12:30 am, when the Defendant took the keys to his car, until 3:00 am, when he saw the Defendant at his house.

Ms. Quinisha Williams testified that in November of 2002, she and her children lived with Mr. Sherrill, and she knew the Defendant to be a friend of Mr. Sherrill. Ms. Williams stated that she saw the Defendant on the night of the murders at approximately 1:20 am, which she remembered clearly because she had been resting on the couch when the Defendant let himself in to her home with a key. Ms. Williams was expecting Mr. Sherrill and noted the time on a clock near the door. Ms. Williams admitted that it was unusual for the Defendant to have a key to her home. Ms. Williams further testified that she and the Defendant then watched a movie until Mr. Sherrill returned home at approximately 3:00 am. On cross-examination, Ms. Williams admitted that she did not tell the police that the Defendant was with her at her home during the time the murders occurred. Ms. Williams explained that no one asked her, and so she did report her story until the Defendant's preliminary hearing, conducted some ten days after the crime took place.

Ms. Shadricka Bostick and Ms. Deandra Shelton testified that they, along with Ms. Wiggins, were in the parking lot the night of the murders and witnessed the shooting. Ms. Bostick described the shooter as "light-colored" with a low-cut hair style, and dressed in a black jacket. At trial, she clarified that he was a "light" man, mixed, white or black, but admitted that she had initially reported to the police that the shooter was a white man. Ms. Deandra Shelton stated that the shooter was a white male with short hair and a black leather jacket. She admitted that when she was shown a photographic lineup, she identified the wrong person. Ms. Shelton also stated that she never did see the shooter's face the night of the murders, but from what she did see, she initially believed it was a white male, but clarified at trial that it was also possible that the shooter was a light-complected African American male.

Mr. Christopher Schultz, who is a white male, testified at the trial that he shot the two victims. Mr. Schultz testified that he was a good friend of the Defendant, and that some of his property had been stolen by Mr. Campbell in the home invasion several years earlier. Mr. Shultz first stated that he arrived at the Outer Limit night club at 2:00 a.m. the night of the murders in his friend's dark blue Saturn. Mr. Schultz then testified that the Saturn was "primarily" his car, but that

it was registered to the Defendant's mother because she had good credit and could get a car loan, and he made cash payments to her for the car. He also stated that other people, including the Defendant, frequently drove his car.

Mr. Shultz testified that on the night in question he was in the parking lot near the night club doing cocaine when he happened to see Mr. Campbell, whom he recognized as having stolen his property several years prior. The two "had a few words," and then Mr. Campbell walked over to a silver car and got into the passenger's side. Mr. Schultz stated that he had in his possession a Glock .40 caliber handgun and two extra clips, which he carried for protection from other drug dealers. Mr. Schultz walked over to the car that Mr. Campbell had just entered, and while he could not see into it due to window tinting, he started firing into the passenger side window "to kill Monty Campbell." Mr. Shultz first stated that he had four rounds in the gun when he started firing, but later testified that he initially had fourteen rounds, then reloaded and shot nine rounds, and then reloaded again and fired five more shots. Mr. Schultz testified that when the window fell in and he saw for the first time that there was a woman in the car, whom he had accidently shot, it "made him even madder," and he fired more rounds, including more at Ms. Caruth because he believed she was trying to drive off. Mr. Shultz stated that he was wearing a black coat at the time of the shootings, and after he had finished he got into the Saturn and his friend, Earl, drove off.[3] Mr. Schultz said he eventually disposed of the jacket he was wearing and threw the gun into the Cumberland river.

Mr. Schultz pled guilty to two counts of first degree murder for his role in the crimes at issue in this case approximately one month before the Defendant's trial. At the Defendant's trial, Mr. Schultz explained that he initially told police that he was not the shooter, but subsequently changed his mind when "too many people were getting caught up in it that didn't have anything to do with it." He also stated that while he entered guilty pleas based on a stipulation of facts which stated that he was the driver and the Defendant was the shooter, he did so only because he did not know he could object to those facts and still plead guilty. At trial, Mr. Schultz insisted that the Defendant was not involved in the murders at issue in any way. However, on cross-examination he admitted that his entire first statement to the police was a lie, and he also lied in his second statement to the police when he stated he was alone in the get-away car.

Mr. David Spence, of the Southeastern Institute of Forensic Science, was certified as an expert in gunshot residue analysis and testified on behalf of the Defendant. Mr. Spence stated that he analyzed the black leather jacket that the Defendant had been wearing when he turned himself in after the murders, and he concluded that this jacket did not contain any gunshot residue particles. On cross-examination, Mr. Spence admitted that some guns produce less residue than others, that a "simple brushing or wiping" would remove residue particles, and that he had no way of knowing whether the jacket he tested was the same one worn by the shooter.

---

[3]The record reflects that Mr. Schultz stated to the police that his friend, Earl, had recently been killed and was therefore unavailable to corroborate his story.

The State recalled Mr. Johnson as a rebuttal witness. Mr. Johnson testified that Mr. Schultz was too tall to be the shooter he saw, concluding that Mr. Schultz was "definitely not the shooter."

At the conclusion of the trial, the jury returned guilty verdicts on all three counts. The trial court merged the felony murder conviction for the killing of Ms. Caruth into the premeditated first degree murder conviction for the killing of Ms. Caruth, and a sentencing hearing was conducted, at the conclusion of which the jury found the Defendant should be sentenced to life without the possibility of parole for the murder of Ms. Caruth. The Defendant also received a concurrent life sentence for the first degree murder of Mr. Campbell. In April of 2004, the Defendant timely filed a motion for new trial, and in January of 2005, he filed an amended motion for new trial. Following a hearing, the trial court denied the Defendant's motion. This appeal followed.

## ANALYSIS

On appeal the Defendant outlined five specific claims in his appellate brief: (1) the trial court erred in overruling his Batson challenge when the State struck three African-Americans in a row during the jury selection; (2) the trial court erred in admitting into evidence a photograph of victim Cayra Caruth; (3) the trial court erred in allowing Officer Steele to testify regarding a statement allegedly made by the Defendant three years prior to the crimes at issue in this case; (4) the trial court erred in not declaring a mistrial when the prosecutor stated in her closing argument that the Defendant said he would "kill" the victim, as opposed to "get" the victim, as ordered by the trial court; and (5) the evidence presented at trial was insufficient to support the jury's verdicts of guilty. We find the Defendant's arguments unpersuasive as to each claim.

### I. Batson Challenge

In the Defendant's first claim, he asserts that the trial court erred when, after an evidentiary hearing on the issue, it overruled his Batson[4] motion pertaining to the State's use of peremptory challenges to strike three potential African-Americans jurors. According to the Defendant, his equal protection right, as guaranteed under Article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution, was violated by the State's actions. To support his claim, the Defendant argues that each individual African-American potential juror struck by the State was "of the same race as the [Defendant], who himself is African-American." Further, because the State: 1) struck all three potential jurors in a row, 2) did not strike any non-African-American potential jurors, and 3) struck 100% of the African-Americans selected from the jury pool at that time,[5] the Defendant asserts that the "manner" in which the State used its peremptory challenges indicates a discriminatory intent to "exclude potential jurors on account of their race." The Defendant also argues that the State failed to provide racially-neutral reasons for striking the three African-American potential jurors. The State argues that the trial court properly ruled that the prosecutor did provide race-neutral reasoning for the exclusion of all three potential jurors.

---

[4] See Batson v. Kentucky, 476 U.S. 79 (1986).

[5] The record reveals that at some point in the jury selection process after the Batson challenge, one more African-American potential juror was struck for "lack of candor," and in the end, only one African-American was seated as a member of the jury in this case.

The record establishes that the Defendant, as well as both victims, are African-American. During the two rounds of peremptory challenges, the prosecution excluded three African-American perspective jurors: Ms. Matthews, Ms. Kwani, and Mr. Wittington. Defense counsel objected to the prosecutor's challenges as possibly based on race and moved for a Batson challenge. The prosecution provided the court with a race-neutral reason for each of the three potential jurors struck, and the court overruled the objection.

In Batson v. Kentucky, the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates the defendant's right to equal protection. 476 U.S. 79, 89 (1986). This Court has emphasized a three prong test for evaluating a claim of racial discrimination in jury selection under a Batson challenge:

> Batson provides a three step process for the evaluation of racial discrimination claims in jury selection. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834 (1995); Batson, 476 U.S. at 96-98, 106 S.Ct. 1712, 1722-24. [Second,] [i]f the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. Purkett, 514 U.S. at 767, 115 S.Ct. 1769, 1770-71; Batson, 476 U.S. at 94, 106 S.Ct. 1712, 1721. Third, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. Batson, 476 U.S. at 97-98, 106 S.Ct. 1712, 1723-24; Hernandez v. New York, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991). In making its determination of whether use of a peremptory challenge was discriminatory, the trial court must articulate specific reasons for each of its factual findings. Woodson [v. Porter Brown Limestone Co.], 916 S.W.2d [896,] 906. The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court. Thus, on appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous. See Woodson, 916 S.W.2d at 906 (citations omitted).

State v. Carroll, 34 S.W.3d 317, 319-20 (Tenn. Crim. App. 2000).

As to the first step we note that, as in Carroll, the trial court in this case did not make an express finding for the record that the Defendant made a prima facie showing of discrimination. See Carroll, 34 S.W.3d at 320. Nevertheless, the court would not have deemed it necessary for the prosecutor to provide race-neutral explanations for all three of the peremptory challenges had it not determined that the Defendant did indeed make a prima facie showing of discrimination. See Woodson, 916 S.W.2d at 905. Accordingly, we will "assume that the court implicitly found that [the Defendant] had satisfied the first prong of the Batson test." Carroll, 34 S.W.3d at 320.

The Supreme Court has held that the determinative issue in the second step of the <u>Batson</u> examination is the "facial validity" of the prosecutor's race-neutral explanation for the exclusion. <u>Hernandez</u>, 500 U.S. at 360. The Court explained that a "neutral explanation" simply "means an explanation based on something other than the race of the juror." <u>Id.</u> Furthermore, unless "discriminatory intent is inherent in the prosecutor's explanation," we are instructed to presume "the reason offered [] be deemed race neutral." <u>Id.</u> Put another way, the <u>Batson</u> requirement for a race-neutral explanation does not require the explanation to be "minimally persuasive" or even "plausible," but simply a reason that does not deny equal protection. <u>Purkett</u>, 514 U.S. at 768-69.

In this case, the trial court found that the prosecutor provided race-neutral explanations for excluding all three African-American potential jurors. To support this conclusion, the court articulated the following specific reasons for its finding:

> The first one that we're at now is Mr. Whittington. And I -- I, clearly, agree with [the prosecutor] about him. I mean he seemed to be upset almost to the point of being bitter about the system . . . .
> Ms. Matthews was a lady you would notice. . . .[She] had a hat on, kind of a large white hat, with sunglasses on. She would have brought some attention to herself and her answers were like [the prosecutor] has suggested, a little bit questionable, I guess, from one standpoint. So I think there's an explanation for her.
> And then finally, Ms. Kwani, she was, really, sort of unusually short and tentative and quick, just give one or two-word answers, and tentative in that, even.

Like the trial court, we find the prosecutor met its burden of providing race-neutral explanations for excluding the three potential jurors in question. Moreover, both the trial court's findings and its dismissal of the Defendant's <u>Batson</u> challenge demonstrate that the court also implicitly determined that the Defendant failed to meet his burden of proving purposeful discrimination, as required in step three of a <u>Batson</u> challenge.

We conclude the prosecutor's basis for the use of the three peremptory challenges were sufficiently race-neutral to withstand a <u>Batson</u> challenge. The prosecutor explained that Mr. Wittington was dismissed because he stated that his sister had been murdered and he was angry at the police for their inept handling of his sister's case. Ms. Matthews was struck because she wore a large hat and sunglasses in the courtroom, for having what the prosecutor described as "a bit of an attitude," and because she was not responsive to questioning. Ms. Kwani was struck because she was very tentative and timid, and the prosecutor believed she lacked the fortitude to sit as a juror in a violent murder case. Accordingly, the prosecutor articulated valid, race-neutral reasons for each of the jurors that it struck via peremptory challenge. The trial court found each reason legitimate and non-discriminatory. We conclude that the Defendant has failed to demonstrate that the trial court erred in accrediting the prosecutor's race-neutral explanations for striking the three prospective jurors. This issue is without merit.

## II. Admission of Photograph

The Defendant next claims the trial court erred in allowing into evidence a photograph of victim Cayra Caruth. To support this claim the Defendant argues that the photograph was "clearly . . . gruesome" and therefore prejudicial, and any probative value was "minimal." Additionally, the Defendant argues that evidence that Ms. Caruth had been shot to death was introduced by the medical examiner's testimony, and therefore the photograph was at most "cumulative" evidence and therefore unnecessary. The State argues that the photograph in question was "not overly gruesome," and was probative of the element of premeditation in the first degree murder charge.

The issue of the admissibility of the photograph in question in this case is governed by Tennessee Rule of Evidence 403 and well established case law. Our rules of evidence provide that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. However, Tennessee courts have "consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)). Our supreme court has further stated that the "general rule, announced in Banks, is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" Id. (quoting Banks, 564 S.W.2d at 950-51). Whether to admit photographs into evidence is within the discretionary authority of the trial court, and such rulings will not be reversed by appellate courts absent a clear showing of abuse of discretion. See State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In this case, the record reveals that a jury-out hearing on the admissibility of the photograph was held in which the trial court ruled the photograph relevant. The court further found that its probative value outweighed any danger of prejudicial effect. As noted by the trial court, the photograph was relevant in that it showed the location of the victim in the vehicle, the close range of the victim to the shooter, and the number of shots fired--all factors relevant to prove an intentional and premeditated killing. See Tenn. Code Ann. § 39-13-202(a)(1).

We further conclude that the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. We do not consider the photograph excessively gruesome or shocking, especially in light of the testimony describing the eight gunshot wounds inflicted upon the victim. While it is true the photograph corroborated testimony presented by other witnesses at trial, a relevant photograph is not rendered inadmissible merely because it is cumulative. See Carter, 114 S.W.3d at 904. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photograph into evidence. This issue is without merit.

## III. Admission of Prior Statement

The Defendant also claims that the trial court erred in allowing Officer Steele to testify at trial regarding a threatening statement he witnessed the Defendant make against the victim three years prior to the murders. This statement, the Defendant argues, should have been excluded "pursuant to Tennessee Rules of Evidence 402, 403, and 404." To support these claims, the Defendant argues:

1) the statement was made three years before the incident at issue in this case, 2) no report was made at the time of the statement, and 3) Officer Steele could not remember the exact words used by the Defendant. The State argues that the statement was properly admitted to demonstrate "motive, identity, and intent."

Tennessee Rule of Evidence 402 provides "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Furthermore, our supreme court has recognized that "other purposes" may include prior acts "admitted to prove such issues as motive, intent, knowledge, absence of mistake or accident, common scheme or plan, identity, completion of the story, opportunity, and preparation." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.6).

Prior to trial, the Defendant, through counsel, submitted a motion to exclude the testimony of Officer Steele, who was scheduled to testify that he heard the Defendant threaten to "get" victim Monte Campbell. The issue was again raised during a jury-out hearing at trial, and the trial court ruled that the prior threatening statement was relevant to show "the previous threat or hostility . . . going to the motive, going to identity . . . and also, intent." Moreover, in its order denying a new trial, the court further stated that the "Defendant's statement, and the circumstances in which it was made, were particularly relevant to the issue of premeditation." The trial court also found that the probative value of the statement outweighed the risk of unfair prejudice.

The record reveals that the Defendant was charged with first degree premeditated murder for shooting the victims to death approximately three months after victim Monte Campbell was released from prison. Three years prior, immediately before the victim was imprisoned for robbing the Defendant, the Defendant threatened he would "get" the victim when the victim got out of jail. Thus, this threatening statement was highly relevant to the issue of motive, intent, identity, and premeditation.

Furthermore, the statement's probative value outweighed any danger of unfair prejudice. The fact that three years transpired between the threat and the crime "affects only the weight, not the admissibility of the evidence." State v. Smith, 868 S.W.2d 561, 575 (Tenn. 1993). It matters not that an official report was never made at the time of the threat, and as to reliability, the trial court expressly ruled that it was "convinced by clear and convincing evidence" that Officer Steele witnessed the Defendant threaten to "get" the victim, "or something . . . of this nature was said." Accordingly, we hold that the trial court properly found the testimony concerning the Defendant's

prior threatening statement directed at the victim was admissible pursuant to Tennessee Rule of Evidence 404(b). This issue is without merit.

## IV  Failure to declare a Mistrial

In the Defendant's fourth claim, he asserts that the trial court erred in not declaring a mistrial when the prosecutor stated in her closing argument that the Defendant threatened to "kill" the victim. To support this claim the Defendant argues that even though the trial court had made an express evidentiary ruling excluding the prosecution's use of the word "kill" as it pertained to the prior threatening statement made by the Defendant against victim Monte Campbell, the prosecutor nonetheless used the word "kill" in her closing argument. This, the Defendant argues, was "highly inflammatory," prejudicial, and was not supported by the evidence presented at trial. As such, the Defendant asserts that the trial court erred in failing to "declare a mistrial upon the [Defendant's] objection to such argument." The State argues that the use of the word "kill" was an unintentional slip-of-the-tongue, and in no way affected the verdict or mandated a mistrial.

A mistrial should be declared in a criminal trial only in the event of "manifest necessity" that requires such an action. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The determination of whether to grant a mistrial rests within the "sound discretion" of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent "a clear abuse of discretion on the record." State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). Additionally, the burden of establishing the necessity for mistrial lies with the party seeking it. Williams, 929 S.W.2d at 388. Furthermore, no abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

The record reveals that during a jury-out discussion, the trial court inquired of Officer Steele whether the threat he witnessed the Defendant make against the victim was that he would "get him" or "kill him," noting there was a difference. The witness responded that he was not certain of the exact words but was certain of the threat. Accordingly, the trial court made the ruling that the word "get," but not "kill," would be allowed into evidence pursuant to Tennessee Rule of Evidence 404(b). The testimony submitted by Officer Steele at trial was that the Defendant threatened to "get" the victim. However, during closing arguments, the prosecutor stated: "There were a lot of coincidences in this case. . . . You have to believe that it's a coincidence that [the Defendant] swore to kill the victim three years ago and then that victim is killed just a short time after -- after he gets out of prison. That's quite a coincidence." Defense counsel objected, moving to strike the prosecutor's argument pertaining to a threat to kill, arguing that it "never came into evidence" and was "not accurate." The trial court replied that the jury had "heard the evidence," and it was up to them "to decide what [the evidence] is." At no point during this exchange did defense counsel request a mistrial. However, now on appeal, the Defendant argues that the trial court should have sua sponte declared a mistrial upon the defense counsel's objection.

Our supreme court has long recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn.1998). However, arguments must be "temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App.1995)). The established test for determining whether prosecutorial misconduct based on improper comments amounts to reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the defendant's detriment. See Harrington v. State, 385 S.W.2d 758, 759 (1965); State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). In measuring the prejudicial impact of alleged prosecutorial misconduct, courts have been instructed to consider the following factors: (1) the conduct complained of viewed in the context of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution in making the statement at issue; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App.1976). See also Goltz, 111 S.W.3d at 5-6.

In this case, the circumstances suggest that the prosecutor, in the process of advancing the State's revenge killing theory, was attempting to remind the jury of Officer Steele's testimony concerning the Defendant's threat that he would "get" the victim, but the prosecutor erred and said "kill." Additionally, the curative measures undertook by the trial court were lacking; the court merely stated that the jury was responsible for remembering what was actually admitted as evidence. While the jury was provided with a general instruction that counsels' statements during closing arguments were not evidence, the court should have provided a prompt curative instruction. See, e.g., State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997). However, there is nothing in the record before this Court to suggest that the prosecutor's misstatement was anything other than an unintentional mistake. In the jury-out hearing, the witness had initially stated that the Defendant threatened to "kill" the victim. Moreover, the record is devoid of any other prosecutorial errors; clearly there was no pattern of inflammatory or improper argument. Finally, taken as a whole, the State presented a strong case: there was evidence of a motive to harm victim Monte Campbell; the Defendant stated that he would "get" the victim; there was eye-witness testimony that the Defendant was the shooter; and there was substantial forensic and physical evidence linking the Defendant to the crimes. We again note that the Defendant did not request a mistrial.

We conclude the evidence establishes that the prosecutor's misstatement during her closing argument was not so improper or inflammatory so as to affect the jury's verdict in this case. Thus, the error was not so egregious as to warrant a mistrial. Accordingly, we conclude that the trial court did not err in failing to declare a mistrial. See Mathis, 969 S.W. 2d at 422 (holding that the trial court was not required to grant a mistrial based on a witness' reference to a prior threat); State v. Brewer, 932 S.W.2d 1, 27 (Tenn. Crim. App. 1996) (holding that a mistrial was not required after a witness made a statement that the Defendant had been bankrupt, even though there had been a pretrial order that the defendant's bankruptcy was not to be mentioned at trial). This issue is without merit.

-13-

## V. Insufficient Evidence

In the Defendant's final issue on appeal, he asserts that the evidence presented by the State at trial was insufficient to support his two convictions for first degree murder. To support this claim, the Defendant essentially argues that the evidence presented by the defense would not allow any rational trier of fact to find the Defendant was the perpetrator of the murders beyond a reasonable doubt, pointing specifically to the testimony of Ms. Williams that the Defendant was with her during the time the crimes took place, Mr. Schultz's confession to the murders, and the expert testimony that there was no gunshot residue on the Defendant's coat.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree murder as charged in this case is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In the case at hand, the Defendant does not challenge the fact that the two victims were murdered or that the killings were premeditated and intentional, rather the Defendant argues that their was insufficient evidence presented at trial that he was the person who committed the murders.

The record indicates that several years prior to the murders at issue in this case, Monte Campbell robbed the Defendant and was sent to jail for approximately three years. The Defendant was witnessed threatening to "get" Mr. Campbell when he was released from prison. Several months after Mr. Campbell was released from prison, he and Ms. Caruth were shot to death. Ms. Hazelitt

witnessed the Defendant walk by and look at the two victims several times shortly before the murders. Mr. Johnson witnessed the shooting and identified the Defendant the shooter.

Furthermore, the Defendant's reliance on Ms. William's testimony concerning an alibi fails to account for the fact that the jury heard Ms. Williams admit that while she was aware the Defendant had been charged with murder, she nonetheless did not tell the police that he had been with her until approximately ten days after the murders. The Defendant also wishes to rely on the confession of Mr. Shultz, but he fails to acknowledge that Mr. Schultz admitted in front of the jury that he repeatedly lied to police, he was heavily involved with drugs and other criminal activity, and he had already pled guilty to and been sentenced to life sentences for his involvement in the murders pursuant to a factual stipulation that indicated he was the driver and the Defendant was the shooter. The Defendant also relies on the expert testimony that no gunshot residue was found on the Defendant's coat. However, the jury heard the expert testify that he had no way of knowing if the jacket he tested was the one used by the shooter, and even if it was, a simple brushing or wiping would remove any evidence of gunshot residue.

In short, the Defendant argues that this Court should discount the testimony of Mr. Johnson and that of the other witnesses presented by the State, accredit the testimony of Mr. Shultz and the other witnesses called by the Defendant at trial, and overturn the verdict of the jury. However, as stated above, this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236. Furthermore, questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Id. Accordingly, after considering all the evidence in a light most favorable to the prosecution, we determine that the Defendant has failed to demonstrate that the jury was presented with insufficient evidence at trial for any rational trier of fact to find him guilty of both first degree murders beyond a reasonable doubt. Thus, this issue is without merit

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____

DAVID H. WELLES, JUDGE